UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

!SDC SDNY
)OCUMENT·
LECTRONICALLY Fl.
«)C #:_____
ᴵᵀ ᵀ️ILED: ᙭ |ᾄ||ᢩ

UNITED STATES OF AMERICA

-against-

KENROY GLADDEN,

Defendant.

07-cr-1229-2 (JSR)
16-cv-9994 (JSR) (KNF)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Before the Court is defendant Kenroy Gladden's motion to vacate his sentence pursuant to 28 U.S.C. § 2255. See Motion to Vacate, ECF No. 83.[1] The Honorable Nathaniel J. Fox, United States Magistrate Judge, held an evidentiary hearing on April 19, April 20, and May 17, 2018. Judge Fox subsequently issued a Report and Recommendation recommending that the Court grant Gladden's motion. Report and Recommendation ("R&R"), ECF No. 139. The Government timely filed objections, see ECF Nos. 140-41, to which Gladden responded, see ECF No. 143.

For the reasons that follow, the Report and Recommendation is adopted in part and Gladden's motion is granted.

**I. Procedural History**

As set forth in more detail in the Report and Recommendation, see R&R 1-7, Gladden was convicted, after a jury trial, of one count of conspiracy to distribute and possess with intent to

---

[1] Unless otherwise indicated, all ECF citations are to the criminal docket.

1

distribute more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 846; one count of distribution and possession with intent to distribute of more than five but less than 50 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii); and one count of possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A). At the time of conviction, conspiracy to distribute more than 50 grams of crack triggered a mandatory minimum sentence of 10 years' imprisonment, or, for someone who, like Gladden, had a prior felony drug conviction, 20 years. See 21 U.S.C. §841(b)(1)(A) (2006). This Court imposed the mandatory minimum sentence of 300 months' incarceration, comprising 20 years for the crack charge and five years consecutive for the gun charge. See Judgment, ECF No. 32.[2]

The Second Circuit affirmed Gladden's conviction on appeal, but vacated his sentence based on then-applicable circuit precedent decided after the initial sentencing, which held that the mandatory consecutive minimum for the § 924(c) charge did not apply when, as here, the defendant was also subject to a separate, longer mandatory minimum. United States v. Gardner, 369 F. Appp'x 190, 192 (2d Cir. 2010) (summary order) (citing United States v.

---

[2] Gladden's codefendant, Edward Gardner, was convicted in the same trial and received a sentence of 180 months' incarceration.

Williams, 558 F.3d 166 (2d Cir. 2009)). The court therefore remanded for resentencing. See Mandate of U.S.C.A. 6, ECF No. 40. Subsequently, the Supreme Court abrogated Williams, see Abbott v. United States, 562 U.S. 8 (2010), but Congress then enacted the Fair Sentencing Act ("FSA"). Among other things, the FSA increased the weight threshold to trigger the highest mandatory minimum sentence for distributing crack cocaine from 50 grams to 280 grams, and the threshold for the second-highest mandatory minimum from five grams to 28 grams. See Fair Sentencing Act § 2(a), 124 Stat. 2372 (2010) (codified at 21 U.S.C. § 841).

During the resentencing on remand, Gladden sought reduction of his sentence pursuant to the FSA. This Court initially held that the FSA did not apply retroactively to offenders who, like Gladden, were convicted prior to its enactment. See Memorandum Order and Judgment, ECF No. 53. The Court therefore reimposed the original 25-year sentence. But the Supreme Court held soon after that the FSA does apply to such offenders, see Dorsey v. United States, 567 U.S. 260, 263 (2012), and so the Second Circuit again vacated Gladden's sentence and remanded for de novo resentencing, see Mandate of U.S.C.A., ECF No. 57. The result of all this was that Gladden was still subject to mandatory minimum sentences for both the crack charge and the gun charge, but his minimum for the crack charge was only 10 years, resulting in a total mandatory minimum of 15 years.

3

For the second resentencing, the Court asked the parties to brief the issue of whether the Sentencing Guidelines' eighteen-to-one "multiplier" for crack offenses – i.e. recommending the same offense level for a given quantity of crack cocaine equal to the offense level for that eighteen times that quantity of powder cocaine – was rational. Based on the parties' submissions, see ECF Nos. 60-61, and its own review of the available research, the Court concluded that this disparate treatment of crack and powder cocaine was not rational. See Opinion and Order 11, ECF No. 63. The Court therefore declared that it would calculate Gladden's Guidelines range based on the offense level for powder cocaine. Id. The Court further found that, although the offense of conviction required only 50 grams or more of crack, in fact at least 3.6 kilograms of crack were involved in the conspiracy. See Tr. June 30, 2014, at 3. The Guidelines range would therefore have been 147 to 168 months, but, as a result of the statutory minimums, it was increased to 180 months. Id. at 24. The Court imposed a sentence of 204 months, or 17 years. Id. at 31; Amended Judgment, ECF No. 71.[3] It is that amended judgment that Gladden now collaterally attacks, asserting that he was deprived of the effective assistance of counsel.

---

[3] Gardner received an amended sentence of 150 months. Tr. June 30, 2014, at 20:19-24.

4

Specifically, Gladden's motion asserts five separate grounds for relief: (1) that his trial counsel was constitutionally ineffective for failing to move to suppress evidence recovered from Gladden's car; (2) that his trial counsel was ineffective for stipulating that the drugs involved were crack cocaine, rather than powder; (3) that his trial counsel was ineffective for not objecting to the admission of a firearm seized from another person; (4) that his appellate counsel was ineffective for not arguing that Gladden's prior New York state conviction does not qualify as a "controlled substance offense" for federal sentencing purposes; and (5) that his appellate counsel (who also represented Gladden at his resentencing upon remand) was ineffective for failing to object to the Court's drug quantity calculation during resentencing. Magistrate Judge Fox recommended granting Gladden relief on the first, second, third, and fifth grounds. R&R 78, 80-81, 83, 91. The Government timely filed objections.[4]

---

[4] Gladden filed a letter that is labeled an "objection" on ECF, but in fact urges the Court to adopt the Report and Recommendation in full, and directs the Court's attention to further evidence in the record that purportedly supports granting the motion. See Def. Obj., ECF No. 142. Gladden did not file any objection to Judge Fox's recommendation that his fourth claim for relief be rejected. Accordingly, any such claim is waived. See Fed. R. Civ. P. 72(b)(3). In any event, upon de novo review, the Court finds that Gladden's prior New York state conviction for third-degree attempted sale of a controlled substance qualifies as a "felony drug offense" for federal sentencing purposes, in that it is an "offense . . . that prohibits or restricts conduct relating to narcotic drugs" and is "punishable by imprisonment for more than one year." 21 U.S.C. § 802(44); see also N.Y. Penal Law §§ 70.70(2)(a)(ii), 110.05(4), 220.39 (attempted third-degree sale is a class C drug felony, punishable by

5

## II.  **Discussion**

Having reviewed the Report and Recommendation, the parties'
contentions, the transcript of the evidentiary hearing, and the
underlying documents, the Court hereby adopts all of Judge Fox's
proposed findings of fact, except as specifically indicated below.
However, the Court adopts some, but not all, of Judge Fox's
proposed conclusions of law. As discussed in greater detail below,
the Court does not adopt Judge Fox's recommendation that Gladden's
motion be granted on grounds two, three, or five. The Court agrees,
however, that Gladden is entitled to relief on ground one. The
Court will discuss those arguments in reverse order, beginning
with the arguments that the Court rejects and finishing with the
one ground that merits relief.

### A.  Standard of Review

All of Gladden's claims sound in ineffectiveness of counsel.
To establish ineffectiveness, a defendant must show both that (1)
his counsel's performance was below the threshold of minimal
competence required by the Constitution and (2) he was prejudiced.
Deficient performance means performance "outside the wide range of
professionally competent assistance." Strickland v. Washington,
466 U.S. 668, 690 (1984). Counsel is presumed to render

---

determinate sentence of one to five and one-half years). Gladden's
appellate counsel was not ineffective for failing to challenge the
sentencing enhancement for Gladden's prior drug conviction, because he
had no colorable grounds on which to do so.

satisfactory performance, and "the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms." Kimmelman v. Morrison, 477 U.S. 365, 384 (1986). Competent counsel is expected, among other things, to make reasonable investigations, or to have reasonable grounds for not making such investigations. Id. at 385.

A showing of prejudice requires proof that "counsel's errors were so serious as to deprive the defendant of a fair trial," that is, "a trial whose result is reliable." Id. at 687.

## B. Claim Two: Failure to Contest Lab Results

Gladden contends that trial counsel was ineffective for stipulating that the drugs recovered were "cocaine base" – what is more commonly known as crack cocaine. The record contains a police "memorandum" purporting to identify a package of drugs vouchered on September 29, 2007 as "cocaine" with a weight of 24.584 grams and a "purity" of 87.9%. R&R 79. The memorandum does not facially distinguish between crack and powder cocaine, and, as Judge Fox noted, the memorandum is not itself a lab report certified by a qualified chemist.

Judge Fox concluded that, in the absence of a lab report confirming the drugs recovered to be crack, trial counsel erred in stipulating to that fact. R&R 79-80. The Court disagrees. The cocaine at issue was sold by Najir Williams – a cooperating co-conspirator who testified against Gladden at trial – to an

7

undercover officer on September 29, 2007. Tr. 38-39, 286-88, 380-81.[5] Williams testified that the package contained crack that he had purchased from Gladden. From this alone, a reasonable juror could readily conclude that the drug in question were crack. Moreover, Gladden's conviction did not rest solely, or even primarily, on the single package of crack recovered. Rather, it was based on the evidence relating to the entire conspiracy, and that evidence pointed to crack, not powder, cocaine. In addition to Williams' testimony, which focused exclusively on crack, crack cocaine was recovered from the search of Gardner's residence. Defense counsel could readily have concluded, therefore, that it might be better not to make an issue of this matter, since demanding a lab report risked distracting the jury from Gladden's primary defense, which was that he simply was not a part of the charged conspiracy.

Gladden's suggestion that the identification of "cocaine" somehow excludes the possibility that the drugs were crack, Def. Resp. to Gov't Obj. 20, ECF No. 143, is meritless. Crack cocaine is cocaine; a positive result for "cocaine" on a lab test is equally consistent with crack or powder. Indeed, that is largely why the Court declined to recognize the 18-to-1 sentencing

---

[5] Citations to "Tr." Refer to the trial transcript. Citations to "Hrg." refer to the evidentiary hearing held before Judge Fox on April 19, April 20, and May 17, 2018.

8

disparity between crack and powder cocaine at the 2014 resentencing: because "crack and powder cocaine are simply two forms of the same chemical substance having the same physiological and psychotropic effects." United States v. Gardner, 20 F. Supp. 3d 468, 469 (S.D.N.Y. 2014) (quotation omitted).

Thus, because all available evidence suggests that Government Exhibit 20 was crack cocaine, and that it would have weakened the defense to make an issue of it, Gladden has not demonstrated that trial counsel was ineffective for stipulating to that fact.[6]

C.    Claim Three: Failure to Move to Suppress Gun

Gladden next argues that his attorney was ineffective for not moving to suppress a gun recovered from the bedroom of a third party. During the investigation of this offense, police searched the residence that codefendant Gardner shared with Cornelius Brown and Najir Williams. R&R 81. Police found two guns in the room that Gardner and Williams shared, Tr. 92-93, and a third gun, a Bryco .380 pistol, in Brown's room, Tr. 104. Williams, who testified as a cooperator at trial, said that Brown was, for the most part, unaffiliated with Gardner and Williams' drug dealing. Tr. 425.

---

[6] In a letter supporting the Report and Recommendation, Gladden urges the Court to take notice of additional stipulations not referred to by Judge Fox. See Def. Obj. to R&R, ECF No. 142. The Court concludes that none of those stipulations constituted ineffective assistance for substantially the same reasons as the one addressed in detail, to wit, the abundant supplementary evidence that the drugs were, in fact, crack rather than powder cocaine.

Williams testified that he observed Gardner and Gladden exchange crack for two guns in the summer of 2007. Tr. 404-07. He described one of the guns as being small and silver-colored, which he identified at trial as the Bryco .380. Tr. 407-10. It was this alleged purchase of guns with crack that served as the basis for Gladden and Gardner's convictions for gun possession in relation to a drug trafficking crime.

Judge Fox concluded that the failure of Gladden's counsel to object to the admission of the Bryco .380 was not a "sound strategic decision" because the gun was "unrelated to the instant conspiracy." R&R 82. The Court disagrees. Williams testified that Gardner and Gladden exchanged crack for the Bryco, making it directly relevant to the conspiracy. The gun was admitted into evidence as Government Exhibit 34, and both Williams and Detective Dina Moretti, who recovered the gun, identified it. While it is true that the Bryco was found in the possession of Brown, who does not appear to have been part of the charged conspiracy, that would not justify excluding the gun. It might provide fruitful fodder for cross-examination, to determine whether Williams' testimony linking the gun to Gladden was truthful, but that is all. Counsel was therefore not ineffective for failing to object to the gun's admission; he had no meritorious objection to raise.

It should also be noted that, even assuming arguendo that counsel lacked any good reason to not object, the Court would still

10

conclude that Gladden was not prejudiced. Williams testified that
Gardner and Gladden purchased two guns, and Gladden does not
challenge the admission of the second, which was found in Gardner
and Williams' room. The jury therefore had a sound basis to convict
Gladden on the gun possession charge without ever considering the
Bryco .380. Moreover, the very fact that the Bryco was more
tenuously connected to either Gardner or Gladden than the guns
seized directly from Gardner's room makes it exceedingly unlikely
that the jury relied on the Bryco to convict. There is thus no
reasonable likelihood that the admission of the Bryco, even if
erroneous, contributed to the verdict.

Gladden argues that the Bryco was damaging because it
corroborated Williams' testimony, which was otherwise subject to
doubt. Def. Resp. to Gov't Obj. 22. Of course, the fact that
evidence corroborates testimony is not, in and of itself, a reason
to exclude that evidence; quite the contrary, it is a basis for
admission. But the more pressing point is that the gun did not,
itself, corroborate Williams' testimony. The fact that a gun was
found in the possession of a third party did not give the jury any
reason to believe Williams was telling the truth about how Gardner
and Gladden allegedly acquired that gun. Rather, Williams'
purported identification of the Bryco was only as reliable as the
jury otherwise found his testimony to be. The jury evidently
believed Williams, despite urging otherwise from defense counsel,

11

and the Court has no reason to think the admission of the Bryco played any role in that credibility determination.

Accordingly, trial counsel was not ineffective for failing to object to the admission of the Bryco .380.

## D. Claim Five: Failure to Object to Drug Quantity Calculation

Gladden also contends that the Court's finding, during the 2014 resentencing, that the crime involved at least 3.6 kilograms of crack violated the law of the case doctrine, because during the initial sentencing the Court simply adopted the Presentence Investigation Report's finding that the crime involved 50 to 150 grams.

"The law of the case doctrine has two branches. The first requires a trial court to follow an appellate court's previous ruling on an issue in the same case. This is the so-called 'mandate rule.' The second and more flexible branch is implicated when a court reconsiders its own ruling on an issue in the absence of an intervening ruling by a higher court. It holds that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise." United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002) (quotations, citations, and footnote omitted). Where a case is remanded for de

novo sentencing, however, issues not previously considered may be addressed on remand. Id.

The Court finds no law-of-the-case violation here, for two reasons. First, the Court's factfinding on remand did not violate the Second Circuit's mandate, which explicitly ordered de novo resentencing. See Mandate, ECF No. 57. The Court was therefore free to reconsider any pertinent issues in resentencing. See Pepper v. United States, 562 U.S. 476, 507 (2011) (where appellate court remands for de novo sentencing, district court is free to make new calculations on remand, even on issues unrelated to appellate court's ground for setting aside original sentence). Second, additional factfinding was made necessary by intervening events between the original sentencing and the 2014 resentencing. At the time of Gladden's original sentence, very little attention was paid to the exact quantity of drugs involved, because the mandatory minimum sentence was so high as to render the Guidelines calculation moot. See Tr. Apr. 21, 2008, at 4, ECF No. 128. Indeed, the Court explicitly stated at the time that, but for these mandatory minimums, the Court would have imposed a lower sentence. Id. at 4-5.

By the time of the 2014 resentencing, however, the FSA had substantially lowered Gladden's mandatory minimum sentence, offering the Court much more discretion in crafting the appropriate sentence. It therefore became necessary for the Court to reach a

more precise conclusion as to the quantity of drugs involved and to decide on a term of incarceration that reflected Gladden's individualized culpability, as opposed to a statutory requirement. Moreover, there is no serious dispute that the crime at issue involved substantially more than just the 50 grams of drugs that formed the basis of the count of conviction. Under these circumstances, counsel was not ineffective for failing to contest the drug quantity.

Judge Fox concluded that this Court's factual findings regarding the amount of drugs and Gladden's relative culpability violated the rule of Alleyne v. United States, 570 U.S. 99 (2013), by increasing Gladden's minimum sentence based on facts not found by a jury. R&R 89-90. The Court disagrees. The minimum sentence Gladden faced at resentencing, 15 years, was based on the quantity of drugs found by the jury that convicted him: 50 grams of crack cocaine.[7] True, the Court imposed a higher sentence - 17 years - based on its finding of additional facts not found by the jury. But nothing about that process violated Alleyne. "[B]road

_____

[7] Technically, the crack offense triggered a five-year mandatory minimum, increased to 10 years by Gladden's prior conviction, plus a five-year mandatory consecutive minimum triggered by the gun charge. The jury found all of the facts necessary to support each of those minimum sentences, with the exception of Gladden's prior conviction, which is itself the subject of an explicit exception to the standard rule. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction," jury must find all facts essential to punishment) (emphasis added); Alleyne, 570 U.S. at 111 n.1 (noting this exception).

14

sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." Alleyne, 570 U.S. at 116. Thus, judges are permitted to consider a variety of facts, beyond those found or even considered by the jury, "to select a sentence within the range authorized by law." Id. at 117. Indeed, that is the essence of sentencing: to consider a great many factors, ranging from the offender's personal characteristics and history to the manner in which the crime was committed, so as to arrive at a just sentence. All that Alleyne forbids is the use of judicial factfinding to trigger a mandatory sentence. It does not abrogate the traditional judicial role of utilizing factfinding in order to select the appropriate sentence from a range of alternatives.

Accordingly, the Court finds no error in the 2014 resentencing.

## E. Claim One: Failure to Move to Suppress Evidence Recovered from Car

Finally, Gladden contends that his trial counsel was ineffective for failing to timely move to suppress evidence recovered from Gladden's car. Here, the Court is satisfied that Gladden has carried his burden of showing, by a preponderance of the evidence, that he was deprived of the effective assistance of counsel. The Court therefore adopts Judge Fox's recommendation, R&R 78, that Gladden's habeas petition be granted on this claim.

### 1. Pertinent Facts

15

Although the material facts are discussed in Judge Fox's Report and Recommendation, the Court will briefly recount those facts necessary to its determination.

a)   The Trial

On September 29, 2007, the police arranged an undercover drug buy from Williams. Detective Dina Moretti observed the transaction. During the buy, Williams told the undercover officer that he needed to obtain "product." Williams then entered a black Range Rover and emerged with cocaine, which he sold to the undercover officer. Tr. 285-88. Because the police did not recognize the driver of the Range Rover, Moretti directed a patrol car to initiate a pretextual stop to identify him. Tr. 58. Through this, they learned that the driver was Gladden. Tr. 36-37. Afterwards, Moretti traveled to where the Range Rover had been stopped. She took a picture of the car, which appeared to show it parked at an illegal angle. Tr. 61-62.

On October 2, 2007, Moretti seized the Range Rover. She searched the car and found, in the trunk, a Boost Mobile cell phone activation printout associated with the number 347-934-8943, as well as a linked "walkie-talkie number" of 176*734*9. Tr. 66-67.

On January 25, 2008, the Government sent to Gladden's trial counsel several documents, including "documents found in [Gladden's] vehicle." R&R 50. The notice accompanying those documents stated that the Government intended to offer at least

16

some of the enclosed documents as evidence at trial. On April 9, 2008, the Government sent a subsequent letter including, among other thing, "[d]ocuments obtained during an inventory search of the black Range Rover Kenroy Gladden drove on September 29, 2007." R&R 51. The letter advised that the Government intended to offer, as proof of Gladden's participation in the conspiracy, that "[o]n or about September 22, 2007, Kenroy Gladden, Earnest Ellison, and another individual were stopped by the Yonkers police in the black Range Rover. Kenroy Gladden was driving, and Earnest Ellison was in possession of approximately 50 grams of crack cocaine." R&R 50.

The Boost Mobile printout was received in evidence at Government Exhibit 12 during Moretti's testimony, without objection. Tr. 64-66. Williams later testified that he communicated with Gladden by calling his "point to point number," 734*9. That number was also stored in Williams' phone contact list next to the name "A Wile." Gov't Exh. 3503-O.

While cross-examining Moretti, trial counsel complained, for the first time, that he had only received notice of Exhibit 12 on April 9, and that he would have moved to suppress that exhibit if he had received earlier notice. Tr. 178. Counsel acknowledged receiving the document itself in January, but claimed to have been "away the entire month of January, February," because of his wife's serious illness. Tr. 814. The Government represented that the car was seized pursuant to "police caretaking procedures" because it

17

was "parked illegally" "[i]n the same spot where it was stopped, immediately after the transaction." Tr. 234. The Government based this assertion on a "photograph" – Government Exhibit 4 – that Moretti "will testify to being accurate, representing how the car was parked." Tr. 236.

The Court received briefing and heard oral argument on April 24. Noting that it was "not disputed" that "there is no Fourth Amendment violation when the police impound a car that is parked illegally," the Court concluded that the Range Rover was parked illegally "based on photographic evidence." Tr. 640. The Government argued that the seizure was justified both because the car was parked illegally and because there was probable cause to believe it had been used to transport narcotics. Tr. 645. The Government conceded, however, that a warrant might have been necessary if not for the illegal parking. Tr. 646. The Government represented that Exhibit 12 was "highly probative" because it was "corroboration of Najir Williams' testimony" about "Kenroy Gladden's number" and it "establish[ed] the contacts between [Williams] and [Gladden] on the day of the transaction." Tr. 646-647. The Court ultimately concluded that counsel had waived any objection by failing not only to move to suppress, but to object when the exhibit was first offered. Tr. 821-822.

b)    The Post-Conviction Hearing

18

Several witnesses testified at the hearing conducted by Judge Fox. Gladden's trial counsel had "no recollection" of any discussion with Gladden about a suppression motion, although he testified that he would have filed one if Gladden had asked him to. Hrg. 20, 30. Gladden, in contrast, testified that he had asked his trial counsel to file a suppression motion, but that his counsel had refused, saying there was nothing worth suppressing. Hrg. 70. But in the Court's view, Gladden's testimony is not credible because, inter alia, it is contradicted by Gladden's own prior sworn affidavit, filed in support of his motion to vacate, in which he represented that his trial counsel "did state that he would file a motion for suppression on the issue of documents seized from the Range Rover without a warrant." Affidavit ¶ 6, ECF No. 85. These two opposing statements are in such blatant contradiction on such a critical point as to cause the Court to conclude that Gladden will say anything that seems to serve his purpose, regardless of what the truth may be.

At the hearing, Gladden conceded that he did not own the Range Rover, but claimed to be driving it with the permission of the owner, Eslin Woolcock. Hrg. 51. He testified that, when he was stopped on September 29, 2007, he was only a few buildings away from his house. Hrg. 52. Because Gladden's license was suspended, he did not drive away after the stop; instead, his girlfriend, Reena Esty, came and drove for him. Hrg. 51, 53. He denied ever

19

returning the car to the spot where he had been stopped. Hrg. 54–55.

Reena Esty also testified at the hearing and generally supported Gladden's version of events. Specifically, Esty testified that she picked up Gladden after he was pulled over on September 29. Hrg. 123-124. She further testified that, on the morning of October 2, 2007, she drove her kids to school, then returned home, parked the car, and went inside. Hrg. 124. Gladden then went out to use the car, but came back in and informed her it was missing. Hrg. 124. Esty also claimed she told Gladden's counsel, during the trial, where the Range Rover had been parked prior to the seizure. Hrg. 130, 135-136.

Detective Moretti testified at the hearing before Judge Fox, but remembered little about the case – understandably, given the passage of time. She could not remember, for example, whether she had taken a picture of the Range Rover, even after being shown the picture to refresh her recollection. Hrg. 158. She could not recall when the Range Rover was searched, nor what kind of documents she recovered. Hrg. 164. She could not remember how the Range Rover was moved. Hrg. 165. She could not remember preparing a voucher for the vehicle. Hrg. 166. She could not remember whether she tore apart the wiring, paneling, and carpeting as part of the search. Hr. 172. At one point she testified that the Range Rover was illegally parked when it was seized, Hrg. 182, though she could

not remember where or when, Hrg. 185, or how it was removed, Hrg. 186, or what she did next, Hrg. 186. She admitted that she could not remember whether it was actually seized from the spot where it was supposedly illegally parked, Hrg. 187, but only that "at some point [she] saw the car parked illegally." Hrg. 189.

Finally, the owner of the Range Rover, Elsin Woolcock, testified that she was a childhood friend of Gladden's and that she gave him permission, in writing, to use her car. Hrg. 194, 196. Woolcock testified that when she retrieved her car from the police, the interior had been completely torn up. Hrg. 199-200.

Although Judge Fox, a very able and experienced judge, credited the testimony of Gladden and Esty regarding the movement and parking of the Range Rover between September 29 and October 2, 2007, the Court, for the reasons already stated above, finds Gladden's testimony on any issue insufficient to carry his burden, because he is clearly prepared to lie when it suits his purpose. Esty, however, is a different story. While her relationship with Gladden obviously must be considered, her account is more intuitively plausible than the Government's. It seems unlikely that Gladden would simply abandon his Range Rover for three days. In contrast, it is entirely believable that Gladden would let Esty, with whom he was living at the time, use the car to drive her children to school.

More importantly, the Government has never - not during the original trial, and not during these proceedings - offered a shred of evidence that the Range Rover was, in fact, still illegally parked on October 2 in the same place it was pulled over on September 29. To be sure, the AUSA at trial effectively represented that Detective Moretti would testify to that effect (a representation on which the Court relied), but Moretti never did so. And during the hearing before Judge Fox, although Moretti initially testified that the vehicle was illegally parked when it was seized, she eventually conceded that she had no idea how the vehicle was seized, or whether it was illegally parked at the time. All she could say was that it had been illegally parked at some point - which is consistent with Gladden's version of events, but would not support seizure of the car based on illegal parking on October 2.

Moreover, even what little Moretti claimed to remember by the time of the hearing is of little probative value, given her lack of memory on virtually everything about the matter. To be clear, the events at issue were long ago, and the Court has no reason to suspect Moretti was not honestly relaying her entirely natural loss of memory about distant events. Nonetheless, given her inability to remember virtually all the relevant details, the Court cannot be confident that any of Moretti's hearing testimony accurately reflects the events of this case.

22

Further still, none of the arrest paperwork corroborates the Government's claim that the Range Rover was illegally parked; indeed, none of the contemporaneous documentation so much as hints at that fact. This omission, in and of itself, does not demand the inference that the Rover was not illegally parked. But it underscores the Government's failure to meet Esty's testimony with any countervailing evidence.

Based on the trial and hearing transcripts, as well as the remainder of the record, if Gladden's trial counsel had conducted an adequate investigation, he would have concluded that there was a good basis to move to suppress the items seized from the Range Rover on the ground that the vehicle was not illegally parked at the time of the seizure on October 2, 2007.[8]

2. Discussion

---

[8] Judge Fox found, based on a careful examination of Government Exhibit 4, that the photograph was likely taken while Gladden was still pulled over. Specifically, Judge Fox concluded that "a right rear-view mirror and part of the passenger-side front of a white vehicle are depicted" in the "lower left side of the photograph," which was "likely the marked police vehicle that pulled over Gladden, as it appears to be located immediately behind the black Range Rover." R&R 65-66. This would suggest that Gladden may not have been illegally parked even on September 29, 2007, as motorists are not bound by ordinary parking restrictions when they pull over at the direction of law enforcement. See N.Y.C.R.R. Title 34, § 4-08(a)(1) ("No person shall stop, stand or park a vehicle . . . other than in accordance with . . . pavement markings . . . unless . . . in compliance with law or direction of any law enforcement officer . . . .") (emphasis added). The Court does not dwell on this point, however, because regardless of the legality of the parking on September 29, there is insufficient evidence that the vehicle was illegally parked on October 2, the date of seizure.

23

With the foregoing in mind, the Court concludes that Gladden's trial counsel - despite the generally high quality of his advocacy - did not render effective assistance when he, failed to timely seek suppression of the items taken from the Range Rover. Specifically, counsel's failure to file a suppression motion was not a legitimate tactical decision, but rather the result of a failure to investigate. Counsel concededly was given the pertinent documents as early as January 25, 2008, and again on April 9, 2008, but, by his own admission, made little or no effort to review them to determine their import, let alone discuss them with his client or investigate further.

The Court recognizes, and is sympathetic to, the fact that counsel was beset at the time with dealing with the overriding issue of his wife's serious illness; but, obviously, that cannot excuse a failure to investigate a matter of such importance. If counsel had been unable to dedicate the necessary time to investigating and moving for suppression, he could have applied to the Court for an adjournment, or even to be relieved. What he could not permissibly do, however, was ignore his duty to investigate whether there was a basis for suppression of the material seized from the vehicle. Cf. Morrison, 477 U.S. at 385 ("The trial record in this case clearly reveals that Morrison's attorney failed to file a timely suppression motion, not due to strategic considerations, but because, until the first day of trial, he was

24

unaware of the search and of the State's intention to introduce the bedsheet into evidence.").

The Government argues that counsel could not have been expected to file a motion for suppression because Gladden did not affirmatively tell him "how the Government's version of the facts was incorrect" and therefore did not give him a "reason to believe that the Range Rover was improperly seized." Gov't Obj. 16, ECF No. 141. But, as noted above, there is simply no indication that counsel ever discussed the documents seized from the Range Rover with Gladden, or that he ever asked his client about the circumstances of the seizure. It was counsel's job to ask those questions, and, more generally, to investigate the circumstances of the seizure.[9]

Prejudice, however, is a more difficult issue. To prevail on his ineffectiveness claim, Gladden must show a reasonable probability that the outcome would have been different but for his attorney's failings, i.e., he must show not only that he might have succeeded at a suppression hearing, but that the suppression

---

[9] Although the Government also seems to be arguing at time that trial counsel could not have raised the suppression issue sooner than he did – at trial, after the exhibits had already been admitted – this is contradicted, among other things, by the very argument the Government made at the time (discussed above), which led the Court to conclude that the suppression issue had been waived. For, as the Government argued at the time, trial counsel was given the relevant documents and information months before trial and did nothing.

of the Boost Mobile printout might reasonably have changed the result of the trial.

### a) Standing

The Government first argues that Gladden could not have prevailed at any suppression hearing because he could not have established standing. Gov't Obj. 8. The Government does not contend that Gladden lacked a reasonable expectation of privacy in the Range Rover simply because he was not the owner of the vehicle. See United States v. Pena, 961 F.2d 333, 337 (2d Cir. 1992) ("It is not the law, however, that only the owner of a vehicle may have a Fourth Amendment privacy interest therein that is protected against governmental invasion. Rather, the borrower of an automobile can possess such an interest."). However, the Government argues that Gladden lost any privacy interest in the materials he left in the car when he thereafter lent the car to Esty.

This might be a difficult issue in other circumstances, but the Government has forfeited this argument by its utter failure to raise it before Magistrate Judge Fox. "In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." Hubbard v. Kelley, 752 F. Supp. 2d 311, 313 (W.D.N.Y. 2009) (alteration omitted) (quoting Illis v. Artus, No.

06-CV-3077, 2009 WL 2730870, at *1 (E.D.N.Y. Aug. 28, 2009)). The Government had every incentive and opportunity to raise its standing argument before Judge Fox, either in its initial opposition to Gladden's motion or in a supplemental filing thereafter. It failed to do so. The Court therefore deems this argument forfeited.

Furthermore, even if not forfeited, the argument is not in the end persuasive. To begin with, the evidence at the hearing established that Gladden and Esty were romantically involved and co-habitating at the time of the seizure. It is one thing to say that, by lending a car to an acquaintance, or even a friend, a defendant risks losing any legitimate expectation of privacy in the contents of the car. It is quite another to hold, as the Government urges, that persons who are living together and romantically involved cannot jointly hold a privacy interest in a shared vehicle.

The cases cited by the Government all deal with seizures effected while the borrower was driving the car. See United States v. One 1986 Mercedes Benz, 846 F.2d 2, 4 (2d Cir. 1988) (per curiam) ("The evidence indicates that Chow was driving the Mercedes . . . .") (emphasis added); United States v. Gomez, 199 F. Supp. 3d 728, 739 (S.D.N.Y. 2016). Here, in contrast, Esty borrowed the car to drive her children to school, completed that trip, and returned to the home she shared with Gladden prior to the seizure.

27

It is untenable for the Government to argue that Gladden lacked any privacy interest in the vehicle simply because Esty used it last.

The Government also argues that Gladden lacked standing because his license was suspended. Gov't Obj. 11 (citing United States v. Lyle, 919 F.3d 716 (2d Cir. 2019)). But Lyle is distinguishable for two reasons. First, the Second Circuit held only that a driver who is both unlawful and unauthorized has no reasonable expectation of privacy in the vehicle. Lyle, 919 F.3d at 729. Here, while Gladden could not lawfully drive without a valid license, he was authorized to use the car by the vehicle's owner.

Second, and more importantly, Gladden was not driving the car at the time of the seizure. While he could not drive the car without a valid license, see N.Y. V.T.L. § 511, no law prevented him from keeping the car parked outside. Thus, the question is not whether Gladden would retain a cognizable privacy interest while unlawfully operating the Range Rover; it is whether, simply by virtue of Gladden's suspended license, the police were free to seize and search his parked vehicle for any reason or no reason at all. The Court has no trouble concluding that, whatever the limitations of an unlawful driver's privacy interest, the law still respects the right of an authorized borrower to exclude others from entering or seizing the borrowed vehicle while it is parked.

Accordingly, the Court finds that Gladden could have established standing to challenge the seizure of the Range Rover at the time of any pretrial suppression hearing, and that he has established standing for the purpose of this proceeding.

### b)    Whether the Car was Validly Seized

Next, the Government contends that the police were authorized to seize the Range Rover. First, the Government argues that the Rover was illegally parked at the time of the seizure. Gov't Obj. 12-13. As already observed, however, the evidence of record does not support that conclusion, or, at most, leaves it unresolved. To be sure, when the Court issued its trial ruling denying defense counsel's belated attempted at suppression, it mentioned what the Government represented Detective Moretti would say (though this was not the ground on which the Court denied the motion).[10] But now that, because of the hearing before Judge Fox, we have the benefit of Moretti's testimony, we know that, at least as of now, she has

---

[10] At the time, the Court also alluded to the likelihood that the vehicle was illegally parked "based on photographic evidence." Tr. 640. However, the photo of the car from September 29 was only probative insofar as it could be supported by testimony from Moretti establishing that the car was in the same position when she ultimately seized it – testimony that she never offered. Furthermore, at the time it made this statement, the Court, based on colloquy with Government counsel, was operating under the mistaken impression that Exhibit 4 showed the car as it was parked on October 2, which the Court now understands not to be the case.

no idea whether, in fact, the Range Rover was illegally parked at the time that it was towed.[11]

The Government's alternative theory is that the Range Rover was subject to seizure because it was used in narcotics trafficking and was therefore forfeitable. Gov't Obj. 14. Once again, this argument was plainly forfeited because it was never raised before Judge Fox. See Hubbard, 752 F. Supp. 2d at 313. In its opposition to Gladden's motion, the Government argued, among other things, that the search was proper because the vehicle was illegally parked. See Gov't Opp. 11, ECF No. 96. The Government did not, however, argue that the forfeiture exception applies.

The thorny issues presented by the forfeiture question illustrate why parties are deemed to have forfeited arguments they fail to raise promptly. The forfeiture exception applies "when a car is properly seized by the police pursuant to a forfeiture statute." United State v. Gaskin, 364 F.3d 438, 458 (2d Cir. 2004) (emphasis added) (quoting United States v. Zaicek, 519 F.2d 412,

---

[11] The full exchange is:

Q. You don't really recall whether or not the car was illegally parked when it was seized?
A. Correct.
Q. All you know is that at some point you saw the car parked illegally?
A. Yes.

Hrg. 189.

414 (2d Cir. 1975)) (internal quotation marks omitted); see also Florida v. White, 562 U.S. 559, 565 (1999) (upholding forfeiture authorized by Florida law). Here, the Government has not cited any New York law suggesting that forfeiture was authorized under the circumstances of this case.

Furthermore, there are several different New York statutes governing forfeiture, each of them apparently positing different procedures, and at least some of them do not seem, on their face, to authorize seizure. For example, the Administrative Code of the City of New York authorizes the City Property Clerk to take custody of "all property or money suspected of having been used as a means of committing crime or employed in aid or furtherance of crime . . . that shall come into the custody of any member of the police force." N.Y.C. Admin. Code § 14-140(b) (emphasis added). That language most naturally suggests authorization to retain property lawfully seized (say in the course of effecting an arrest), but not to provide independent authorization to seize property in the first instance.

Indeed, forfeiture of a vehicle because of its use in drug trafficking under New York law typically appears to accompany an arrest. See, e.g., Krimstock v. Kelly, 306 F.3d 40, 44 (2d Cir. 2002) ("[T]he City can seize a motor vehicle following an arrest for . . . any [] crime for which the vehicle could serve as an instrumentality."); Crandall v. David, 457 F. App'x 56, 57 (2d

31

Cir. 2012); Property Clerk v. Aponte, 552 N.Y.S.2d 118, 119 (App. Div. 1st Dep't 1990) (mem.); Property Clerk v. Negron, 550 N.Y.S.2d 351, 352 (App. Div. 1st Dep't 1990) (mem.). While none of these cases state that seizure of forfeitable property may only be accomplished in conjunction with an arrest, the fact that this procedure appears to be unusual gives the Court further pause. Nor, from the Court's independent research, does it appear that the New York Court of Appeals has supplied a definitive answer to this question.[12]

In light of the complicated issues presented, the Government cannot belatedly ask this Court to decide the availability of forfeiture under New York law, independent of an accompanying arrest, without any briefing on the subject and without citation to any New York authorities or statutes. While the issue may not be free from doubt, the Court concludes that the Government has forfeited argument that the forfeiture exception justifies the seizure that occurred here.

Even addressing the merits, the Government's argument fails. The Government bears the burden of proving that an exception to the warrant requirement applies. See United States v. Kiyuyung,

---

[12] Were the option of certification to the New York Court of Appeals available, this Court might well consider it. That procedure, however, is only available to the Supreme Court, federal courts of appeals, and the high courts of other states. See N.Y. Ct. App. Rule 500.27(a), 22 N.Y.C.R.R. Part 500.

171 F.3d 78, 83 (2d Cir. 1999). In this case, that means, at a minimum, identifying the "forfeiture statute," Gaskin, 364 F.3d at 458, that purportedly authorized the seizure. The Government has made no effort to do so and so has not met its burden of showing that the warrantless seizure was permissible. At a minimum, there is a reasonable probability that the Government would not have been able to establish the applicability of the forfeiture exception at a pretrial suppression hearing.

That does not end the inquiry, however, for Gladden must additionally show that there is a reasonable probability that the suppression of Government Exhibit 12 would have changed the outcome of the trial. This is perhaps the closest issue of all.

Government Exhibit 12 included two documents that inculpated Gladden. First, the Exhibit included a Boost Mobile printout of a cell phone number, 347-934-8943, and an associated walkie-talkie number, 176*734*9. The Government argues that no prejudice accrued from this document because this information was cumulative; Williams testified to Gladden's phone number, the number was saved in Williams' phone, and Sprint call records were introduced into evidence. Gov't Obj. 17. The Government exaggerates the extent of the other evidence linking Gladden to this phone number. First, the phone records do not reference Gladden at all. One of the phone numbers is attributed to Gardner, but none are linked to Gladden. Tr. 634-36. Thus, although the phone records show activity coming

33

from the number ending in 734*9, that activity could not be associated with Gladden without additional evidence – such as the Boost Mobile printout. Similarly, the number 734*9 was saved in Williams' phone as "A Wile." Gov't Exh. 3503-O. It therefore could not be linked to Gladden, except with Williams' testimony or the printout.

Thus, apart from the Boost Mobile printout, the only evidence linking Gladden to the phone numbers found in the car – 347-934-8943 and 176*734*9 – was Williams' testimony. To be sure, the jury might have credited Williams even without any corroboration. But there were also substantial reasons to doubt his credibility, including that Williams himself participated extensively in the narcotics conspiracy and was testifying in exchange for favorable treatment from the Government. The Government, recognizing as much, argued in summation as follows:

> The second number, we know that's the point-to-point, the walkie-talkie number Kenroy Gladden was using on September 29. How do you know this[?] This is what Najir Williams had in his phone book for that. He had the last four digits, 734*9. Again, you don't have to take Najir Williams' word for it alone, because when [D]etective Moretti searched Kenroy Gladden's car, she found this. This is a document confirming the subscription for that phone. There is the number right there at the top, 176[*]734*9, and it's dated September 13, 2007.

Tr. 725 (emphasis added). In short, to connect Gladden to that phone number without the Boost Mobile printout, the Government needed the jury to believe Williams' testimony – which it may or

34

may not have done. But with the aid of the printout, the Government had independent documentary evidence linking Gladden to a host of communications with Gardner and Williams, and the Government also gained corroboration of Williams' testimony, which may have made the jury more inclined to trust his word on other matters relating to the conspiracy. While the Government now tries to downplay the importance of Exhibit 12, the Court agrees instead with the Government's contemporaneous assessment of its importance: that it was "highly probative" and "an important fact establishing the contacts between Najir Williams and Kenroy Gladden." Tr. 646-47.

The second important document recovered from the Range Rover was a property receipt stemming from a traffic stop in Yonkers, when Gladden was driving the Range Rover and his passenger, Earnest Ellison, was arrested for possession of cocaine. The Government used this arrest to support the inference that Gladden was generally involved in cocaine trafficking. Notably, the Yonkers arrest did not appear when the police ran a computer check on Gladden, and the police discovered it only thanks to the property receipt.

Nonetheless, the Government now ridicules the suggestion that the "investigation would not have included a review of all of Gladden's arrests beyond those turned up on a preliminary computer check." Gov't Obj. 18. In other words, the Government appears to be making an argument for the application of the inevitable

discovery doctrine - an argument that, once again, the Government failed to raise with Judge Fox. But, in any event, the argument is meritless. "The inevitable discovery doctrine requires the district court to determine, viewing affairs, as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." In re 650 Fifth Ave. and Related Properties, 830 F.3d 66, 102 (2d Cir. 2016) (quoting United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992)) (internal quotation marks and emphasis omitted). "To show that the inevitable discovery exception to the exclusionary rule applies, the burden is on the Government to prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered." Id. (quoting United States v. Vilar, 729 F.3d 62, 84 (2d Cir. 2013)) (internal quotation marks omitted).

The Government has utterly failed to meet its burden here. It does not even attempt to explain how the Yonkers arrest would have been discovered or what steps would likely have been taken to lead to that discovery. Instead, the Government tries to reverse the burden, asserting that there is no reason to think the police would not have stumbled across this arrest - even though a computer check did not reveal it, and even though there is no obvious reason why

the NYPD would have gone looking for evidence of wrongdoing in Yonkers.

The discovery of the Yonkers arrest strengthened the Government's case against Gladden. At trial, the defense argued that, although Gladden had been driving on September 29, 2007, he was not involved in the drug deal. But the Government eviscerated that defense by pointing to the Yonkers arrest:

> Think about the Yonkers arrest that you heard about . . . Kenroy Gladden was caught just one week before this deal driving the same black Range Rover with a different person in his car who was carrying 50 grams of crack. Is Kenroy Gladden just the unluckiest man in the world, just sheer coincidence, just incredibly bad luck that he happened to be driving around two different people carrying large amounts of crack cocaine in a single week . . . ?

Tr. 715. Importantly, beyond Najir Williams' testimony, there was not much evidence directly linking Gladden to the entire conspiracy. Gladden was charged with a conspiracy to sell drugs that spanned several months, between May and September of 2007, Tr. 31, but Williams testified that Gladden supplied the drugs for only one sale, on September 29, while Gardner provided the drugs eight separate times, Tr. 380-81. Detective Moretti similarly testified that she did not see Gladden at any of the sales prior to September 29. Tr. 161-63. In fact, she did not even know who Gladden was prior to that date, after nearly five months of investigation. Tr. 164.

37

It is true that there was strong evidence that Gladden was present for the September 29 sale. Standing alone, however, and given his apparently total absence from the conspiratorial events observed by the police to that point, there is a reasonable possibility that the jury might have believed Gladden's participation was isolated to that incident, and that he was not a part of the broader conspiracy. Because the September 29 sale involved fewer than 50 grams of crack, it alone could not have sustained Gladden's conviction. And while Williams' testimony inculpated Gladden, there were substantial reasons to doubt his credibility, as already discussed. The Boost Mobile printout corroborated Williams' testimony and linked Gladden to the phone records, while the Yonkers property receipt connected Gladden to another drug transaction, close in time to the September 29 sale, and involving use of the same vehicle. Together, this evidence made it substantially more plausible that Gladden was, in fact, involved in the broader conspiracy. Without that evidence, the jury might have been significantly more skeptical of the Government's theory.

Accordingly, the Court finds that there is a reasonable possibility that, but for the admission of the evidence seized from the Range Rover, the outcome of the trial would have been different.

**III. Conclusion**

For the foregoing reasons, the Court hereby adopts Judge Fox's Report and Recommendation in part. Gladden's motion to vacate the judgment is granted. Gladden shall be detained pending a new trial or any appeal from this Opinion and Order. Both parties are directed to jointly call chambers, no later than two weeks from the date of this Opinion and Order, to schedule further proceedings.

The Clerk of the Court is directed to close docket entry 83 on the criminal docket and to close the civil docket.

SO ORDERED.

Dated:     New York, NY

August 20, 2019                    JED S. RAKOFF, U.S.D.J.